FOURNET, Chief Justice
(dissenting).
My inability to agree with the conclusion reached by the majority causes me much regret. Great as is my respect for my colleagues who subscribe to that view, I cannot, in good conscience, join them in extending — by the employment of the equitable maxims of estoppel and res judicata that, in my humble opinion, have no application here from either a legal or factual standpoint — the decision of this court in the prior case of California Co. v. Price, 225 La. 706, 74 So.2d 1, 29,[1] to include the funds now deposited in the registry of the court from entirely different wells drilled in entirely different sections of land than those involved in the former suit, and to also interpret the former holding as decisive of the title to all of the property claimed by the Beckwith group in Grand Bay. My conviction that the prior decision is unsound and should not be perpetuated remains unwavering, and, affecting as it does, the water bottom of an arm of the sea as well as all of the other navigable *361 waterways of the state, “it takes no seer or prophet to foretell,” as Mr. Justice Hawthorne so aptly observed in his able and exhaustive dissent in the former decision, “that as a result of this decision private individuals will successfully claim title under old patents to the beds of numerous bays on the Gulf, large lakes, etc., from which oil is being or will be produced,” thus diverting into private hands untold millions of dollars derived from the sale of minerals produced from the beds of these waterways that would normally flow into the state treasury, and this at a time when there is such a crying need for new sources of revenue with which to properly operate the state government, its eleemosynary institutions and our schools.
That the prior opinion was erroneous and unsound was clearly demonstrated in the three dissenting opinions in the previous case, and particularly that of Mr. Justice Hawthorne, wherein he masterfully revealed that the majority view was predicated on neither sound law nor jurisprudence, but, instead, was based on a flimsy structure of obiter or pronouncements out of context, and by the misapplication of rules of statutory construction and interpretation, with total disregard of the express codal and statutory provisions of the state and the jurisprudence thereunder that had been in existence for more than 100 years, all of which he carefully analyzed and traced to their source showing that all navigable waters, and particularly arms of the sea, are vested in the state in its sovereign capacity and are to be held in trust for the people of the state and cannot be conveyed to private individuals by grant, sale, or express legislative authorization, much less by implication.
The fact that the title to submerged land vested in the state in its sovereign capacity, was held in trust for the benefit of all of the people, and can never be transferred to private individuals is a fundamental matter of sovereignty that pertains in all of the states of this union and throughout the entire world, was recognized in a very exhaustive opinion by the Supreme Court of the United States in Illinois Central Railroad v. State of Illinois, 146 U.S. 387, 13 S.Ct. 110, 118, 36 L.Ed. 1018, in 1892. In that case the Illinois Central Railroad, having been ceded by the legislature in 1869 the title of the State of Illinois in and to approximately 1,000 acres of submerged lands constituting the bed of Lake Michigan, which act was repealed by the legislature in 1873, contended the first act had vested it with title to the property and that title could not thereafter be revoked. The determination of that issue, according to the Supreme Court, posed the question “Whether the legislature was competent to thus deprive the state of its ownership of the submerged lands in the harbor of Chicago, and of the consequent control of its waters.” In answering that question in the *363 negative the court said: “A grant of all the land under the navigable waters of a state has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation," reasoning that a state “can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties * * * than it can abdicate its police power in the administration of government and the preservation of the peace.” In conclusion the court held that “any attempted cession of the ownership and control of the state in and over the submerged lands in Lake Michigan, by the act of April 16, 1869, was inoperative to affect, modify, or in any respect to control the sovereignty and dominion of the state over the lands, or its ownership thereof, and that any such attempted operation of the act was annulled by the repealing act of April 15, 1873, which to that extent was valid and effective. There can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it.” (The emphasis has been supplied by me.)
Whether Beckwith ever secured a legal patent has never been considered by us inasmuch as the only matter for determination in a concursus proceeding is a prima facie showing of right to disputed funds deposited in the court. From matters brought to our attention by the Attorney General in the instant case, as well as from independent research, I am personally convinced Beckwith never secured a legal patent and that the one he did secure could under no circumstance be given any legal efficacy, even if it were to be conceded the state had authority and power to place the title to this arm of the sea in a private individual.
The documents on which the Beckwith claim is predicated were secured during the years 1873 and 1874, a turbulent period in Louisiana history when the state was ridden by the confusion and corruption that resulted when northern political adventurers poured into the south in the wake of the Civil War. The patent of November 4, 1874 (secured by John Beckwith, an ex-general of the Union army), was signed by William Pitt Kellogg, native born to Vermont but a resident of Illinois who was sent to Louisiana by President Lincoln as a political appointee during the military regime and sought to gain control of the state in the election of November 4, 1872, that was the most disputed ever held in the state and the legality of which has not even to this day been determined. As a result Louisiana had two governors, two legislatures, and two sets of governing officials. Despite the fact he had no semblance of legal right or title to the office (indeed *365 John McEnery was declared the winner by the board created at the 1872 legislature to canvass the election results), Kellogg was nevertheless installed by President Grant through the power of the Federal government to satisfy Republican partisan demands and. maintained in office by sheer force of Federal troops, although Grant himself in 1875 characterized the election of 1872 as “a gigantic fraud.” 29 Louisiana Historical Quarterly 394-495.
The documents Beckwith secured during 1873 and 1874 were clearly not signed by the legal governor of Louisiana. Additionally, they were secured upon his fraudulent assertion the property was swamp and marsh lands subject to tidal overflow within the intendment of Congressional acts granting such lands to Louisiana for reclamation by drainage,[2] as well as upon the further fraudulent assertion of subscribing witnesses that they were “well - acquainted with the character of the soil in the” described land which “they have been over and examined * * * and from examination have ascertained and know * * * to be swamp and overflowed land,” although a large .portion thereof was not soil but this extensive arm of the sea that could never have been gone over and examined by these witnesses or ever reclaimed by drainage and was not, therefore, included in the grants from the-government under the provisions of the Congressional acts, and all the more particularly so since title thereto was already in the state by virtue of its sovereignty. (The emphasis has been supplied by me.)
It is obvious, therefore, that the documents secured by Beckwith were without legal effect of any kind for the following reasons: (1) No branch of the government, including the judiciary, can validly vest in a private individual title to the bed of a navigable waterway under the holding in the Illinois case; (2) the bed of Grand Bay was not included in the swamp land grants of the Federal government; (3) the documents were not signed by a legal governor; and (4) were procured in bad faith, through fraud and deceit.
Beckwith left Louisiana after a short stay[3] and neither he nor his heirs were again heard from of made any claim to the property until sought out in Illinois, Massachusetts and California by Price and associates in the 1940s after the region around Grand Bay became rich in mineral *367 potential. But in the meanwhile, title to the property thus secured by Beckwith was adjudicated to the state in 1883 for nonpayment of the taxes for 1881 and 1882. There title remained until the legislature, by Act 258 of 1910, R.S. 9:1101, specifically placed in the state not the redeemable tax adjudicated title to this property, but the full title to the waters of and in all navigable and non-navigable “bayous, lagoons, lakes and bays and the beds thereof ” that were not then “under the direct ozvnership of any person,” the only such property excepted from these provisions being that (1) then under the direct ownership of the person (2) who had acquired it “in good faith.” Section 2. Inasmuch as Beckwith procured this property in bad faith and neither he nor any other person then held it “under the direct ownership,” the title being in the state by virtue of the tax adjudication of 1883, it is obvious that this act, under either or both of the stipulated conditions, vested once again in the state in its full and sovereign right and title. See State v. Board of Com’rs of Caddo Levee District, 188 La. 1, 175 So. 678. Of necessity, when Act 62 of 1912 was adopted two years later, giving the state six years within which to annul any patent it issued, it would have been an absurdity for the state to have instituted suit against itself to annul a patent that passed out of existence two years previously with the adoption of Act 258 of 1910. Furthermore, it was under no duty to do so since that act forever foreclosed whatever right of redemption Beckwith had under the tax adjudication, if, indeed, such right had not accrued under appropriate law in existence prior to 1910, and consequently cannot now be penalized for failing to do that which it was then, under no law or reason, required to do.
It is thus clear that our legislature under the holding by the United States Supreme Court in the Illinois case had not the competency or power to place ownership of and title to the submerged lands of Grand Bay in a private individual even by an outright legislative grant, much less by the implication read into the 1912 act by the majority when the first Price case was here. Yet this court at that time, as aptly observed in unequivocal terms by the author of the majority view here in his former dissent, by a strained and erroneous construction, as well as by an illegal interpretation of a general curative statute (Act 62 of 1912), held this statute had the effect of supplying title to the bed of this navigable waterway although [225 La. 706, 74 So.2d 17] “the patent, purporting to convey the arm of the sea when the law itself says that it cannot be owned, conveyed nothing, not even the shadow of a title, and the necessity for its annulment is immaterial for the reason that Act No. 62 of 1912 cannot be used as a vehicle of conveyance to szipply title when not even a color of title existed.” (The emphasis has been supplied by me.)
*369 Inasmuch as my learned associate did not repudiate any portion of this former dissent in the majority opinion he has written here, I take it he still entertains the view the former decision is totally wrong for the reasons set out in that dissent, as Mr. Justice Hawthorne has expressly done in his concurring opinion in the instant case. But I cannot follow the rationale of their view that because it is stated in the body of the opinion in the first Price case that the Beckwith Patent No. 1965 “was tacitly confirmed and rendered unassailable by the inaction of the state and the provisions of Act No. 62 of 1912,” [74 So.2d 7], our decree in that case vested in the Beckwith group the title to the bed of Grand Bay so as to forever preclude the state from asserting any claim to the funds now on deposit in the registry of the court as the result of the present suit. The state can certainly not tacitly confirm by inaction an act it is prohibited from doing expressly and directly. And neither the legislature by act nor this court by decree can render a patent to the bed of an arm of the sea unassailable when the United States Supreme Court has expressly held “There can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it” (The emphasis has been supplied by me.) [146 U.S. 387, 13 S.Ct. 118]
The fallacy of the reasoning of the majority lies in the fact that the “thing adjudged” in the former case was not title to the bed of Grand Bay nor any portion thereof, for one need only refer to the record in both proceedings and to the applicable law [4] to ascertain that the matter of the title to the bed of this navigable waterway is not involved in either of these suits. That it was not adjudicated upon in the former case can be readily ascertained by a reference to the decree that recognized the Beckwith group to be the “owners of the funds on deposit in the registry of the court, as well as to all additional funds that may hereafter be deposited * * * attributable to the production from the eight wells situated in the bed of Grand Bay” (located in Sections 20 and 22, T. 19 S.R. 18 E.), “until stick time as this judgment shall become final and executory,” [5] *371 although the Price-Beckwith group there specifically prayed that they recover judgment recognizing them “to be the owners of the fee title * * * to the lands described in Patent No. 1965, dated November 4, 1874, issued by -the State of Louisiana” ' and that our judgment • could under no circumstance have adjudicated the title to the property or have had the effect given it in the majority opinion since it failed to comply with the - specific mandate of the law that “all final judgments of * * * the supreme court affecting the title to immovable property shall particularly describe the property thereby affected.” R.S. 13:4202. See Harris v. Mount Zion Baptist Church, La.App., 198 So. 780; Emery v. Succession of Martel, La.App., 10 So.2d 267; Dupont v. Percy, La.App., 28 So.2d 359; Miller v. Arnold, La.App., 81 So.2d 181. The thing demanded in the instant suit is that the court adjudge the proper distribution of the funds now on deposit in the court’s registry that are attributable to the production from seven wells located in Sections 17 and 19 of T. 19 S.R. 18 E. (The emphasis has been supplied by me.)
I fully recognize the decision in the former case, even though wrong, is, nevertheless, a final and definitive judgment of the court and that the “thing adjudged” there has the force of res judicata as to the funds that were on deposit in the court’s registry up until the finality of that decision and which, as a matter of -fact, were, after the finality of that judgment, withdrawn from the registry of the court and distributed to the.Beckwith group in the claimed proportions, and that as to these particular funds neither the parties nor their privies can ever again be called'in question.
That I am right in my conclusion that that judgment could be used as the basis for a plea of res judicata in no other respect is fortified by the fact that the California Company so understood our former decree as being limited strictly to the funds then on deposit in the court or that would be deposited in the registry of the court up until the finality of that judgment, is evident from the fact that it has since provoked this second concursus proceeding to have distributed under court decree the accumulated funds representing royalty interest in the production from the seven wells in Sections 17 and 19. Had it not so interpreted and understood the decree and judgment in the former case, its action in instituting this present proceeding would have been a vain and idle gesture!
The Attorney General advises the court he has filed an appropriate action in Plaque-mine Parish that will ultimately decide the title to the bed of Grand Bay once and for *373 •all,"and inasmuch as my two associates who dissented with me previously are still of the opinion the former case is wrong in toto, it would seem to me the request of the Attorney General that we remand this case to the lower court with orders that the funds here involved be held in status quo pending the outcome of that suit, or, at least, that we set the case for re-argument so that he — who has been elected since this case was filed and tried in the lower court, lodged here on appeal and the briefs written, and who only took office a few days-before this case was first argued here — might be permitted to present fully his views 'on this vitally important ligation in which • inherent and sovereign rights of the state are involved, was not only a most reasonable one, but a request that should also appear reasonable to my associates adhering to the majority view.
This request appears all the more reasonable when we consider that this court, as a branch of the state government, would thus be lending an ear to an Attorney General who is here exerting every effort and argument in his power in a valiant attempt to keep for the people of Louisiana those bottoms of the state’s navigable 'streams that are rightfully owned by all of them and can never be alienated while,-at the same time, the resources of his office are over-taxed in his desperate struggle in .Washington to secure recognition of Louisiana’s just claims to the bottoms of the Gulf of Mexico outside the three mile limit so rich in mineral potential.
The statement in the majority opinion that “There would be no purpose gained by permitting a re-argument of this' case because it has been -argued and- re-argued and. held for consideration by this court for almost a year, and there is.nothing set out in the motion but what has already been carefully considered by us,” (this is my emphasis), is unimpressive when considered in the light of the New Facts and New Law the Attorney General here calls to our ■attention that was "Never brought to light in •the previous case and Never considered by us, either then or now, as well as in the light of the historical background of the case which, clearly shows the patent was void from its inception- — -even if the power ■of the state to convey was explicit — and was secured through fraud by Beckwith 'who, with his heirs, waited Sixty-Three Years without making any claim whatever thereunder and would not now but for the fact the Price group sought them out throughout the United States aftef the land in the region became extremely valuable mineral-wise. I do not think such people should be permitted to use our courts of justice and to 'employ equitable maxims[6] prevailing in our civil law for the protection of .the innocent *375 to perpetuate and extend this fraud, particularly when it is obvious that on the merits, and without the shield of these technical rules they have no right in law or in equity to invoke, they would be without a scintilla of a legal claim or a shadow of a right.
I therefore respectfully dissent from the action of the majority in maintaining the pleas of res judicata and of estoppel, and also from their action in refusing to permit the Attorney General to reargue the case.

. This decision was by a divided court. The majority view on original hearing was written by Mr. Justice Hamiter. On rehearing Mr. Justice McOaleb was the organ of the court, and he was joined by Mr. Justice Hamiter and Mr. Justice Moise. Mr. Justice LeBlanc concurred only. Mr. Justice Ponder, Mr. Justice Hawthorne, and I all dissented with individually written views.

. 28 Louisiana Historical Quarterly 277-825.

. The state contends, and furnishes documentary proof in support thereof on this hearing, that Beckwith’s fraud was induced by a. .desire to secure all land through which a canal was being proposed for passage to the Gulf from the Mississippi river, and that he left the state and abandoned this land when' an alternative plan for construction of the Eads at the river mouth was adopted as the most feasible one for opening the lower reaches of the river to water commerce through the Gulf.

. R.S. 13:4811, so far as here pertinent, provides: “Whenever any * * * corporation * * * is in possession of any money, which is claimed by two or more persons * * * then such * * * corporation * * * may deposit it in the registry of the district court having jurisdiction * * * and shall thereafter he relieved of all liability for the payment of the money, on complying with the requirements set out in R.S. 13:4811 through 13:4817.” The application depositing the money in the court must set out the manner in which the applicant came into possession of it, the names of persons claiming interest therein (R.S. 13 :4812), who must answer making claim to the money (R.S. 13 :4813), the one prevailing being recognized as the “successful litigant for the funds deposited.” (Emphasis supplied by me.)

. It is obvious from the provisions of R.S. 13:4811 through R.S. 13:4817 as well as from the decree itself, that our former *371 decree could have been res judicata only as' to the funds actually on deposit until the finality, of that decision, and could not even: be res judicata as to additional funds from these same wells accruing after the finality of the judgment. .

. This is particularly true when we consider that neither the plea of estoppel nor' the plea of res judicata is favored in the law and is strictly construed, and, *375 further, that our jurisprudence specifically holds a plea of estoppel can never be used to supply title.